# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

FLOYD JOSEPH ALFANO,

    PLAINTIFF,

VS.                                           CASE NO.: CV-11-J-3055-IPJ

CAROLYN COLVIN,
Commissioner of Social Security,

    DEFENDANT.

## MEMORANDUM OPINION

The plaintiff appeals from the decision of the Commissioner denying his application for Disability Insurance Benefits. The case is now properly before the court. *See* 42 U.S.C. § 405(g). After a hearing before an Administrative Law Judge ("ALJ"), the ALJ found him to suffer from migraine headaches, and to suffer from residual effects of a transient ischemic attack (R. 25), impairments he found to be severe but not to constitute an impairment listed in, or medically equal to, one of those listed in Appendix 1 of Subpart P of Social Security Regulations No. 4 (R. 25). The ALJ expressly found that the plaintiff's "allegedly disabling headache symptoms have not been particularly serious as alleged or can otherwise be treated effectively with medication" (R. 28) seemingly because "as there is some evidence of exaggeration with ride (sic)-sided weakness in the record, the claimant's migraine allegations at the hearing may not be entirely reliable either" (R. 26). He concludes

that the "evidence as a whole fails to confirm disabling limitations arising from the claimant's impairments, and his impairments are not of such severity that they can reasonably be expected to give rise to disabling limitations...."[1] (R. 29-30). The ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act for purposes of receiving Disability Insurance Benefits (R. 30).

The Appeals Council denied review on June 21, 2011 (R. 4-6). This action for judicial review followed. The court has considered the record and the briefs of the parties. For the reasons set forth herein, the decision of the Commissioner is **REVERSED** and **REMANDED** to the Agency for further action in accordance with this Opinion and the accompanying Order.

## Factual Background

The plaintiff was born September 21, 1961, and has a twelfth grade education (R. 390-391). Since his alleged onset date of disability, the plaintiff has been attending community college to take air conditioning repair classes with the hope of being able to do air conditioner repair, but he misses about a quarter of the classes (R. 390-391). His past work has been as a heavy equipment mechanic in various capacities, each of which was medium, skilled work (R. 380, 407). The plaintiff stopped working in January 2008 because of the migraine headaches (R. 393, 395).

---

[1] In other words, the ALJ tautologically concludes that evidence does not support disability based on plaintiff's impairments because plaintiff's impairments are not severe enough to support disability.

The plaintiff's problems began in March 2007 with what was then believed to be a stroke,[2] which left him with right side parethesis problems (R. 381). It began with a severe headache, which plaintiff described "like somebody had been hitting me in the back of the head" (R. 381). Since then, the frequency of headaches keeps him from working because about one-third of the month, he is at home with a severe migraine, for which he lies in bed in the dark (R. 383, 387). As the plaintiff explained, "it wasn't the fact that I wasn't able totally to do the job 100%, is I could not show up. I couldn't even drive. On real bad days with migraines and the attacks, I couldn't even drive to work to show up physically" (R. 384). The plaintiff readily states he can work when he is not having a severe migraine attack (R. 384).

The plaintiff has undergone testing for a variety of diseases, all of which was negative, as multiple doctors have attempted to find the root of plaintiff's medical problems (R. 383).

The headaches have no set frequency, and no known triggers (R. 395-396). The plaintiff stated when he gets one, the only thing he can do is lie down and take the medication doctors have prescribed (R. 385). The shortest one lasted less than two days, while others have lasted more than a week (R. 385). When he has a severe headache, he also has no use of the right side of his body, causing his treating

---

[2]As the plaintiff acknowledged at his hearing, some doctors have questioned whether this event was actually a stroke although he was told it was (R. 383).

physician to refer to them as hemiplegic migraine headaches (R. 386-387). When he has a headache, he just lies in bed (R. 387). His wife assists him with getting up to go to the bathroom, and other than that he does not get up or eat (R. 387, 389).

    Upon further questioning, the plaintiff explained

> Some months you're – you may have – I may have a headache that lasts like three or four days. And that would knock me out the rest of that week on that one. Next week, I may be fine, but just slow. I would be slow. Yeah, struggling through to get through the day. The headache is still there, but it's not as intense and debilitating, but it's still with me. I get those – I live with a headache every day on it. And some of them – some days, I could – like today it's tolerable. Then some days, I'm just debilitated. I'm out.

(R. 388). The plaintiff estimated that 25% of the month, he is completely debilitated (R. 388). When he does not have a headache, his right side strength is roughly half of his left (R. 397).

    Since March of 2007, the headaches have not gotten better or worse (R. 395). To try to control the headaches, plaintiff received an occipital block, but it did not help (R. 248, 389). His doctor had recently prescribed Zomig,[3] which he stated

---

[3] Zolmig is the brand name of zolmitriptan, which belongs to a class of drugs known as triptans. It affects a certain natural substance (serotonin) that causes narrowing of blood vessels in the brain. It may also relieve pain by affecting certain nerves in the brain. It does not prevent future migraines or lessen how often a migraine attack occurs.
http://www.webmd.com/drugs/drug-5400-Zomig+Oral.aspx?drugid=5400&drugname=Zomig+Oral.
    Side effects of triptans include nausea, dizziness, drowsiness and muscle weakness. http://www.mayoclinic.com/health/migraine-headache/DS00120/DSECTION=treatments-and-drugs

"seems to knock it back a little bit, but it doesn't knock it all the way out" (R. 396-397). He also is prescribed gabapentin[4] for maintenance.

In spite of the plaintiff's allegations of an inability to work due to debilitating pain from migraine headaches, the ALJ asked the Vocational Expert ("VE"), no questions concerning the effect of pain on a person's ability to work. Similarly, the ALJ asked no questions which took into account the medically confirmed right-sided weakness plaintiff experiences. However, the VE did testify that missing two out of five work days would violate all expected attendance rules (R. 410). The VE testified that in the realm of unskilled work, missing more than one day of work per month would not be tolerated by an employer (R. 411).

The plaintiff's medical records demonstrate he has been treated for migraine headaches by a variety of doctors with a variety of medications since March 2007 when he presented with slurred speech, right side numbness and headache and was sent to the emergency room (R. 171, 180).[5] He was diagnosed with a CVA and placed on Plavix (R. 170, 184). A similar event occurred in May 2007 when plaintiff presented with slurred speech, right side weakness, difficulty walking and blurred

---

[4]Gabapentin is the generic name for Neurontin, which is used to prevent and control seizures. However, it has been found to have a prophylactic effect for individuals with migraines. http://www.ncbi.nlm.nih.gov/pubmed/11251695

[5]Prior to March 2007 the plaintiff received ongoing treatment due to bulging discs for which he received epidural injections (R. 172-173).

vision (R. 183). A CT scan record from May 2007 noted the plaintiff had right-sided weakness and was being treated with Coumadin (R. 145). That scan found no abnormal densities (R. 145). However, other testing at that time found a suggestion of significant stenosis involving the left brachiocephalic vein with delayed venous flow (R. 147). Plaintiff's regular treating physician referred plaintiff to a neurologist, who diagnosed the plaintiff with Lupus based on elevated ANA, while records at that time noted the plaintiff had a headache since March 20, 2007, off and on (R. 168, 192). Based on possible vasculitis, the plaintiff was also started on Coumadin and referred to a rheumatologist (R. 191). However, a hospital record from the same time period reflects differential diagnoses of cerebral infarction and TIA, complicated migraine, or conversion symptoms (R. 185). The rheumatologist told the plaintiff he did not have Lupus (R. 186).

An October 2007 record mentions that the plaintiff has seen eight neurologists, his right side goes numb, and he takes three days to a week to recover (R. 167). Headaches are noted every day (R. 167). At that time his medical records stated "TIA recurrent" and the plaintiff was prescribed Lortab, after signing a narcotics contract with his doctor (R. 167).

In January 2008 plaintiff's treating physician noted a CVA and poor grip strength (R. 166). Plaintiff's then treating physician wrote that he "[discussed with] Dr. Randy C (my hospitalist). We decided against direct admit & opted for ER for

rapid head CT – Goal: est. anticoag[ulent] tx ASAP [with] admit.  ER charge nurse noticed" (R. 166).  At this time, the plaintiff's medical records reflected a diagnosis of "atypical migraines" (R. 165).  Another record reflects a diagnosis of complicated migraine headache with right arm and leg weakness and abnormal sensation, noting the plaintiff had eight or nine of these "spells" always accompanied by headache (R. 186).  He was prescribed Elavil for help sleeping and migraine prevention (R. 186).

A consultative examination by Dr. Dallas Russell, M.D., a neurologist, referred to the March 2007 event as a cardiovascular accident ("CVA") (R. 160).  Upon examination, Dr. Russell found mild weakness of the right upper extremity as compared to the left (R. 161).  He noted "drift with his arms held straight out in front of him.  He seems to have about 4/5 weakness of muscles of the right arm...." and "4/5 weakness of tested muscles of the right lower extremity," along with decreased sensation on that side (R. 161).  Although he noted some "inconsistencies" in plaintiff's exam, the plaintiff "did seem to have reduced strength and dexterity on the right side as compared to the left" (R. 161).

Plaintiff began treatment at the Veteran's Administration due to his insurance lapsing when he stopped working.  A May 2008 CT scan of his head was normal, but medical records note that plaintiff came to the emergency room with an intense headache and right side numbness "like a dentist had numbed it" (R. 232, 253). Right side ptosis (drooping of the eyelid) was also noted (R. 339-340).  He also reported he

could not work due to right side weakness[6] (R. 253). He was noted to have 4/5 strength in his right upper extremity, with 5/5 strength elsewhere (R. 253). Plaintiff's regular treating physician at that time, Dr. Felicia Noerager, referred him to a neurologist (R. 251). Plaintiff's VA neurologist referred him to the VA Pain Clinic for a consultation (R. 241). Those notes reflect a diagnosis of occipital neuralgia[7] and

---

[6] These records also reflect that the plaintiff quit taking the aspirin, Coumadin, and Plavix which he was prescribed all at the same time due to bleeding which required a transfusion (R. 253). In fact, his records note "it is not clear why the patient was prescribed ASA, Plavix and Coumadin simultaneously" (R. 254). A June 2008 record states that plaintiff "had bleeding complications from aspirin, Plavix, and Coumadin to the extent that he needed a blood transfusion ... I have stopped Tramadol and have advised him not to take aspirin or Plavix..." (R. 330). Sadly, in what can only be described as intentionally misleading, the ALJ states that the plaintiff's migraine allegation "may not be entirely reliable" because "the medical evidence" reflects that "by May 2008 the claimant had quit taking all prescription medicine" although he alleged having "serious debilitating headaches" (R. 26). No evidence supports a finding that Coumadin and Plavix are used for headaches, although they are used for stroke prevention. The failure to mention that the plaintiff was removed from the medications by physicians is evidence of glaring bias by the ALJ.

[7] Occipital neuralgia is a neurological condition in which the occipital nerves -- the nerves that run from the top of the spinal cord at the base of the neck up through the scalp -- are inflamed or injured. Occipital neuralgia can be confused with a migraine because the symptoms can be similar. The main symptom of this condition is chronic headache. The pain is commonly localized in the back of head and around or over the top of the head, sometimes up to the eyebrow or behind the eye. Because chronic headaches are a common symptom for numerous conditions, occipital neuralgia is often misdiagnosed at first. It is characterized by very intense, severe pain that begins in the upper neck and back of the head. This pain is typically one sided, and may radiate forward toward the eye, as it follows the path of the occipital nerve(s). Individuals may have blurred vision as the pain radiates near or behind the eye. The pain is commonly described as sharp, shooting, zapping, an electric shock, or stabbing. The bouts of pain are rarely consistent, even within an individual. The amount of time the pain lasts typically varies each time the symptom appears, it may last a few seconds or be almost continuous. Other symptoms of occipital neuralgia may include aching, burning, and throbbing pain that typically starts at the base of the head and radiates to the scalp. In some patients there may be numbness in the affected area. See http://en.wikipedia.org/wiki/ Occipital_neuralgia; http://www.webmd.com/migraines-headaches/occipital-neuralgia-symptoms-causes-treatments; http://www.hopkinsmedicine.org/neurology_neurosurgery/ specialty_areas/headache/conditions/occipital_neuralgia.html.

state that the plaintiff reported that the pain was continual with waxing and waning (R. 243). He also reported that the pain felt "like somebody whacked me in back of my head with baseball bat" (R. 243). At the time, his pain was a six out of ten, but ranged from a five to a ten (R. 243). He was found to have tenderness in the occipital nerve area as well as his lower lumbar spine and have a slight limp (R. 247). That consult concluded with an impression of chronic headache, right occipital pain, and a history of unspecified hemiplegia/hemiparesis (R. 247). He was referred for an occipital nerve block but reported no relief from this (R. 248, 278, 389).

A January 2009 MRI was performed due to a chronic right side headache and intermittent right hemi body weakness, and the findings were again normal (R. 229). On January 12, 2009, plaintiff was seen at the emergency room for face and jaw pain noted as an 8/10 (R. 270). A neurology clinic note summarizes plaintiff's problems as "unilateral headache associated with R hemibody paralysis. He has had occipital nerve blocks in the past with relief for about 1 week. He has had a constant headache since 3/07 and has intermittent weakness of R hemibody, usually every 6-8 weeks, which then lasts 1-2 days" (R. 263). He also was noted to have 4/5 break-way weakness in his right upper and lower extremity and further noted to drag his right leg (R. 265).

In February 2009 plaintiff's treating physician, Dr. Noerager, completed a food stamp form for plaintiff stating that he was not able to work because of lumbar back

pain from degenerative discs and complicated migraines with right body hemiparesis (R. 367A). She opined his condition was permanent (R. 367A). In May 2009 she completed a headache residual functional capacity questionnaire on plaintiff's behalf (R. 362). In it, she opines that the plaintiff suffers from daily headaches, ranging from a 4 to a 10 out of 10 with severe headaches 1 to 2 times per week (R. 362). She notes he has vertigo, malaise, photosensivity, mood changes, and mental confusion/ inability to concentrate associated with these headaches, with no known triggers (R. 363). Tenderness, impaired sleep and impaired appetite were all noted as objective signs of his headaches (R. 364). Dr. Noerager specifically noted that plaintiff was not a malingerer, and his impairments were reasonably consistent with his symptoms and functional limitations (R. 364). She also noted that preventative medications had been tried to no avail (R. 365). His headaches are of a severity that he is precluded from even basic work activity when he has one (R. 365). Additionally, the plaintiff would need 2-3 additional breaks per work day, of 1½- 2 hours each, before he could return to work (R. 365). She also estimated plaintiff would be absent from work more than four times per month because of his headaches, and had right sided weakness, mild limping, and unsteady tenderness (R. 366).

## Standard of Review

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining: 1) whether there is

substantial evidence in the record as a whole to support the findings of the Commissioner, and 2) whether the correct legal standards were applied. 42 U.S.C. § 405(g); *See Richardson v. Perales*, 402 U.S. 389, 390, 401, 91 S. Ct. 1420, 28 L. Ed. 843 (1971); *Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir.1996); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir.1988). The Court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983). However, this limited scope does not render affirmance automatic,

> for "despite [this] deferential standard for review of claims . . . [the] Court must scrutinize [the] record in its entirety to determine reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622 ( 11th Cir. 1987).

*Lamb*, 847 F.2d at 701. Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 634 (11th Cir.1984).

In determining whether substantial evidence exists, this court must scrutinize the record in its entirety, taking into account evidence both favorable and unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir.1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir.1987). "Even if the Court finds that the evidence weighs against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence." *Allen v. Schweiker*, 642 F.2d

799,800 (5th Cir.1981); *see also Harwell v. Heckler*, 735 F.2d 1292 (11th Cir.1984); *Martin v. Sullivan*, 894 F.2d 1520 (11th Cir.1990).

No presumption of correctness, however, applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F. 2d 1233, 1235 (11th Cir.1991); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir.1991).

**Legal Analysis**

Having reviewed all of the evidence contained in the record, this court finds substantial evidence to support the plaintiff's claim that he is unable to engage in substantial, gainful employment and has been so limited since his alleged onset date.

The ALJ found that the plaintiff's statements were not fully credible by manufacturing "possible exaggerations" (R. 26). The ALJ points to Dr. Russell's one time exam in which he noted reduced strength and dexterity on the right and give-way weakness, but also found "inconsistencies" with the exam upon which he never elaborated (R. 26, 161). Yet Dr. Russell noted the exact same 4/5 muscle strength on the right side as every other doctor who has examined plaintiff noted, noted reduced grip strength on the right side, and noted trouble picking up small objects with the right hand (R. 161). The ALJ also makes much out of a neurology clinic exam which found 5-/5 weakness (R. 26). However, less than 5 out of 5 strength is not inconsistent with 4/5 muscle strength. Similarly, the later finding of 4+/5

strength, mentioned by the ALJ to support his conclusions, is consistent with 5-/5 strength.

The ALJ then uses the above non-existent "inconsistencies" to make the wholly speculative conclusion that because plaintiff "exaggerated" his right side weakness, his allegations of migraines "may not be entirely credible either" (R. 26). The ALJ ignores the medical records actually before him. In fact, the medical records are completely consistent between multiple doctors, including multiple neurologists, all of whom noted right sided weakness and diagnosed the plaintiff with either complex migraines or occipital neuralgia. Dr. Noerager's opinions are wholly supported by the medical records of the multiple other doctors to whom plaintiff was referred. However, by simply disregarding the actual evidence in the record, and making up what he wished the records to state, the ALJ concludes that "there is indication that the claimant's allegedly disabling headache symptoms have not been particularly serious as alleged" (R. 28).

The ALJ next opines that the medical evidence does not support a finding that "objectively determined medical conditions are of such severity that they can reasonably be expected to give rise to disabling pain..." (R. 28). Given the diagnoses of occipital neuralgia and complex migraines, one would expect the ALJ to have applied the pain standard, with the understanding that neither of these diagnoses have

any objective test to confirm them. Rather, these diagnoses are made when objective medical evidence rules out all other possible causes of the pain.

Without further explanation, the ALJ then determines that if the plaintiff finds a job with a sit/stand option, only occasional bending, no climbing, no uneven or rough terrain, no unprotected heights, no driving, and a temperature controlled environment, he will only have mild to moderate restrictions from pain (R. 28). Given that the ALJ opined the multiple doctors who found right side weakness were all mistaken, the basis for these restrictions, particularly the sit/stand option, is unknown. However, the ALJ does assign the non-examining state agency opinion significant weight, finding the same to be consistent with the record (R. 28). The ALJ also concludes that the plaintiff is capable of performing mechanic work at a lower exertional level, despite the VE's testimony that the plaintiff's past relevant work would not transfer to a lighter level (R. 28, 407).

The court finds the ALJ's opinion to be in direct contravention of all of the medical evidence in the record from the plaintiff's numerous examining and treating physicians. The court finds the only way the ALJ could reach his conclusions is by wholly ignoring all of the plaintiff's treating physicians' records, as detailed above. This court has no choice but to find the ALJ substituted his judgment for that of the plaintiff's treating physicians. The fact that the plaintiff's treating doctors, including neurologists, are unable to determine the cause of the plaintiff's headaches does not

make them any less painful. Their medical records detailing various combinations of medications for the plaintiff to try support a conclusion that none of them believed the plaintiff to be exaggerating his pain or right side weakness.

The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-1146. The court finds insufficient reasoning to determine the proper legal analysis has been conducted. The VE's testimony about an individual who experiences mild to moderate pain does not mean that the plaintiff suffers from only mild to moderate pain, even though the ALJ so determined. Additionally, the ALJ's conclusion that the plaintiff can work with a sit/stand limitation has no support in the entire record. The issue regarding the plaintiff's disability is whether his headaches are severe enough to cause him to miss the amount of time from work he alleges he would miss. The VE testified that an employer would not tolerate more than one absence per month in unskilled work (R. 411). All of the medical records reflect that the plaintiff suffers from disabling headaches multiple times per month. The plaintiff himself testified that physically he could work, but for his headaches.

Furthermore, nowhere does the ALJ make any finding with regard to the plaintiff's pain, other than his statement that his testimony regarding the same was not fully credible. The plaintiff has been tried on multiple medications in an attempt to

find something that will relieve his pain and lessen its frequency. No doctor has opined that he is exaggerating his pain, or drug-seeking. Only the ALJ reached the conclusion that the plaintiff's complaints of disability due to headache pain were exaggerated. The ALJ's own opinion of the evidence is not the requisite "good cause" for not giving controlling weight to a treating physician. *See e.g., Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir.1986) (treating physician's opinion is entitled to "great weight" absent good cause to find to the contrary). This court finds that the pain medication prescribed for plaintiff by his treating physicians support his allegations of pain. *See Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir.1995); *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir.1986).

The ALJ clearly ignored the testimony that such pain is disabling, as well as the records finding such a level of pain. The ALJ cannot arbitrarily reject uncontroverted medical testimony. *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir.1982); *see also Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir.1995). "The ALJ is not a medical doctor and his opinion is not to be substituted for medical evidence supporting disability." *Youngblood v. Shalala*, 1994 WL 722863 (N.D.Ala.1994) at 4.

In assessing pain allegations, this court must consider whether any objective medical evidence confirms the level of severity of the alleged pain arising from that condition or whether the objectively determinable medical condition is of a severity

which can reasonably be expected to give rise to the alleged pain. *See e.g. Martinson v. Shalala*, 843 F.Supp. 1448, 1450 (M.D.Fla.1994). The record is replete with medical records detailing the plaintiff's allegations of pain. This court finds the plaintiff's subjective complaints of pain to be credible and equivalent to the pain expected by chronic migraine headaches or occipital neuralgia.

This court finds an abundance of evidence, detailed above, to support the plaintiff's subjective complaints of pain. This court finds these allegations to be credible and in line with the pain expected from someone with the condition the plaintiff suffers. By inferring that the plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file. "[A]s a hearing officer [the ALJ] may not arbitrarily substitute his own hunch or intuition for that of a medical professional." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir.1992) (concurring opinion).

The ALJ did not consider the actual evidence that was in the record before him. His finding that the plaintiff is not disabled is against the substantial weight of the evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990) (stating the ALJ's factual findings are conclusive if supported by substantial evidence). The court finds that the substantial weight of the evidence dictates a finding that the plaintiff has been under a disability since February 28, 2008. However, the plaintiff also testified at his April 29, 2009, hearing that he was trying a new medication and

it seemed to be helping. Thus, the court has no means to determine whether the plaintiff's disability continued past the date of his hearings, and for the purpose of this determination, shall remand this action to the Commissioner.

## Conclusion

Based on the lack of substantial evidence in support of the ALJ's findings and the ALJ's failure to apply the proper legal standards, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Agency for further proceedings, which may include a new hearing and/or reopening the record, to determine whether the plaintiff continues under a disability from April 2009 forward. The court strongly recommends that upon remand, this matter be assigned to any ALJ other than the ALJ who rendered the decision in this case.

**DONE** and **ORDERED** the 19th day of August, 2013.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE